## FLYNN v. UNITED STATES.

### No. 9322.

Circuit Court of Appeals, Eighth Circuit.

April 16, 1932.

Arthur Le Sueur, of Minneapolis, Minn., for appellant.

Robert V. Rensch, Asst. U. S. Atty., of St. Paul, Minn. (Lewis L. Drill, U. S. Atty., and O. A. Blanchard, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for the United States.

Before VAN VALKENBURGH, Circuit Judge, and DAVIS, District Judge.

VAN VALKENBURGH, Circuit Judge.

This is an appeal from a conviction for violation of the National Prohibition Act (27 USCA). The indictment contained eight counts. Appellant was convicted upon the first and eighth counts and acquitted upon the others. The first count charged sale, July 25, 1930, and the eighth transportation on September 26, 1930. Three assigned errors are relied upon to procure a reversal: (1) That the evidence entitled appellant to submission of the defense of entrapment, and that the court erred in refusing to give a requested instruction to that effect; (2) error in the court's charge to the jury; (3) an excessive sentence.

Prohibition Agent Olson, a witness for the government, testifies that about 7:30 in

the evening of July 25th he heard "both ends" of a telephone conversation between William Marcotte, described as an informer, and appellant, Flynn, as follows:

"Mr. Marcotte said: 'Hello, Dr. Flynn. This is Bill Marcotte. I want to get some Scotch. What is the best you can do?' Flynn says: '9.00.' Marcotte said, 'That is too much,' and the voice on the other end of the wire said, 'Well, this is good stuff. It came up from Florida,' and Marcotte said, 'Oh, I know what you are handling. It is cut. You can't fool me,' and the voice on the other end of the wire said, 'I will give it to you for $8.00.' Marcotte said, 'Well, I will be over.' Dr. Flynn said, 'Are you driving?' Marcotte said 'Yes.' Then Marcotte said, 'Well, how do you want to do it?' And Dr. Flynn said, 'Well, I will take your car, I will be waiting for you in the lobby of the building.'"

The building referred to was the Lowry Medical Arts building in St. Paul, Minn., in which appellant had his office. Accordingly at approximately 7:55 that same evening, Prohibition Agent Dike, accompanied by the informer, met appellant at the entrance of this building. What occurred there is best stated in the language of the witness:

"I was introduced to Doctor Flynn as Pat Ritchie and he was introduced to me as Doc Flynn. I was introduced by the man I refer to. This happened on the street, directly in front of the Lowry Building entrance. I had come there in a coupe belonging to the man that I went there with—that was the informer. The car was parked in the neighborhood of seventy-five feet from the entrance to the building. At that time we had further talk with Dr. Flynn. The informer that I was with brought up the subject of buying some Scotch whiskey. He said to Dr. Flynn 'This man here wants to get some Scotch Whiskey,' to which Dr. Flynn replied: 'Well, I can fix you up,' or words to that effect. I asked the Doctor the price of the whiskey and he said eight dollars a quart. I said that would be all right. I told him I wanted six quarts. The informer took a roll of bills which I furnished him, from his pocket, and counted out $50.00, which he handed to Dr. Flynn. Dr. Flynn returned to him two dollars in change. I do not remember the denomination of the bills. I know there was a five dollar bill, and if I remember correctly a twenty dollar bill. I do not know the denominations of the rest of them. I observed the amount of change. It was two one dollar bills. While the change was being made Dr. Flynn said 'With a roll of bills like that you ought to take out a load of alcohol.' He addressed this remark to both of us. I said 'I don't want to take a load now, as I haven't enough money to protect myself on the road.' The Doctor asked the informer about his car, and the informer told him where the car was, and told him he could drive it, but he said he would have to crank it—that the battery was run down. The Doctor said: 'Well, bring it down here yourself then, I don't want to crank it,' and the informer walked down the street to get the car. While he was gone the Doctor turned to me and said: 'I believe I have heard of you before.' I said, 'You possibly have.' He asked me if it was in connection with a still that had been operating close to the cities. I told him no, that I had never been connected with a still close to the cities. The informer returned with the car in a very short time. Dr. Flynn walked out and walked around to the right side of the car—pardon me—the left side of the car, got in behind the wheel, and the informer got·out on the other side of the car and joined me at the Lowry entrance. Dr. Flynn drove the car down St. Peter Street, towards Sixth, and out of my sight. I waited right there at the Lowry entrance for the Doctor to return. I waited approximately twenty minutes. The Doctor returned in the same car—the same Chevrolet, and approached the entrance of the Lowry Building on St. Peter Street, coming from Fifth Street—going towards Sixth—pardon me—he came from Fourth, traveling towards Fifth. He came on the right hand side of the street, the side on which the Lowry Building is located. He stopped the car a few feet towards Fourth Street from the entrance to the Lowry Building, double parking. That is, a few feet before he reached the entrance. He got out of the car, and as it had started to rain he ran from the car to the shelter of the canopy, or whatever you call it, over the entrance to the Lowry Building. I then told the Doctor that I would probably be back in a couple of weeks, and he said, 'Well, you can look Bill up, or you can come and see me, and I will fix you up.' By 'Bill' he referred to the informer. I do not recall the informer's last name. 'Bill' is what I knew him by. I had never worked with this informer prior to this case. I had never seen him before. After this talk about a return visit we went out and got into the car, and the informer passed to the left side of the car and I to the right, and there was a paper-wrapped parcel on the seat of the car. The Doctor had said to me 'I left it in the car,' and we found the package there. It was laid on the seat of the car."

The parcel contained six bottles of "cut" Scotch whisky. Other witnesses corroborated the testimony of Olson and Dike.

It appears that on the evening of September 26, 1930, Marcotte again advised appellant that he wanted "to get some more stuff." In company with Agent Dike, Marcotte went to the entrance of the Lowry building, and thereafter Marcotte, appellant, and another man entered Marcotte's car and drove away. The car was followed by government officers. Shortly afterwards Marcotte was let out, and the others proceeded. A little later the officers found the Marcotte car parked in front of No. 538 Wacouta street in St. Paul. In a few minutes appellant came out of this house carrying a gunny sack that appeared to be of considerable weight. He placed this in the car and drove away. After making several turns, he seemed to realize that he was being followed. Swinging sharply into another street, he jumped from his car, leaving it in motion. At a distance of four blocks he was overtaken and arrested. The abandoned car contained six bottles of Scotch whisky. The following day the house at 538 Wacouta street was searched and found to contain a large quantity of intoxicating liquor of various kinds. On the night of his arrest appellant stated that he had made a few sales, according to the uncontradicted testimony of Deputy Prohibition Administrator Williams. Previous to July 30th, government officers had no evidence against appellant sufficient to sustain a criminal prosecution, but had what is termed "hearsay evidence" of bootlegging activities which prompted them to make the investigation that resulted in the arrest and subsequent conviction. It appears from the testimony that appellant and Marcotte were well acquainted before these transactions were entered into. It is unnecessary to consider whether the informer sustained such relations with government authorities as would make him a governmental agent within the purview of the doctrine of entrapment, because there is in the record nothing to support such a defense. Marcotte merely submitted an offer to buy, accompanied by no unfair method of persuasion. Appellant readily accepted this offer in a manner which indicated that his business was well established and that he needed no persuasion nor appeals to sympathy to induce him to enter into these engagements. This situation was further emphasized by his subsequent acts and statements. The evidence submitted by the government was most convincing, and appellant did not take the stand nor otherwise seek to rebut the testimony of the government witnesses. The trial court committed no error in refusing to give the instruction requested nor in advising the jury that the evidence did not disclose a case of entrapment. That portion of the court's charge which is assigned as erroneous is the following:

"There has been some criticism made of the conduct of the government agents, and while that probably has no bearing upon the main question in this case, I do not want you to go off upon any side issue, so I will advise you that under the law there is no impropriety in a Government Officer, for the purpose of apprehending one engaged in the commission of crime, in offering an opportunity to that person to do what he is engaged in doing, and then prosecuting him for it. If a Postal Clerk is robbing the mails, the natural method of catching him is by the use of decoy letters containing cash which are placed in the mail by the Government itself, and traced into the hands of the dishonest clerk. If he takes the cash, the Government knows that he is the man who is taking the cash out of the mails as they go through his hands. The Government keeps track of those letters from the time they are put into the mails until the time they get into the hands of the clerk, and in that way the Government finds out who is taking money from the mails.

"The narcotic peddler cannot complain when the government agents use one of the victims of his abominable business to purchase his wares with marked government money. The bootlegger is in no better position. He goes into his business with his eyes open. The only reason he can make a profit from the business is because of the law. If the traffic was lawful, the bootlegger would not be able to make a dollar, because nobody would deal with him. In a sense he is engaged in a contest of wits with the government. If he wins, he takes the profits; if he loses, he reluctantly has to take the loss; if he makes a mistake in selling liquor to a government officer, that is his own misfortune, and one of the risks of his business. Ordinarily the methods employed by the criminal are not so high that it lies in his mouth to criticize the conduct of the officer who finally succeeds in apprehending him."

It is urged that this language gave the jury to understand that, in the opinion of the court, appellant was engaged in the bootlegging business prior to the acts charged in the indictment. We do not think the language used was susceptible of this construction, and the court in the succeeding paragraph gave the reverse of the proposition in clear and

appropriate terms: "It is fair, however, to say that it is not the business of Government officers, to make criminals. It is their business to apprehend those who are engaged in the commission of crime. There is a rule of law which says that if a Government officer procures some individual whom he has no grounds to suppose is engaged in the commission of crime, by some unfair method of persuasion, by appealing to his friendship or sympathy, to commit a crime which it is reasonable to suppose he would not have otherwise committed except for the solicitation of the officer; that under those circumstances, that would constitute a defense on the part of the person who was so induced by the officer to commit such a crime."

However, upon objection made, the court removed all possibility of misapprehension on the part of the jury by the following supplemental charge: "The Court: Well, I would like to correct any misapprehension, if there is any. When I was using the illustration as to what methods might be properly used by Government agents, in giving opportunities to those who violated the law, I was not intending to insinuate in any way whatever that in my judgment Dr. Flynn fell within that class. That question is entirely for you to decide. I was just simply pointing out that the mere fact that the Government agent gave an opportunity to a man whom he had grounds to suspect was in the liquor business, to make a sale of liquor and used Government money to do it with, standing alone, was not subject to criticism by the man who was caught, if he was actually engaged in that illegal business, and that was simply done for the reason that the question of what was fair and what was unfair methods was raised by counsel in his argument to you, and I did not want you to be confused with reference to what an officer could properly do or what he could not properly do. The question of the guilt or innocence of Dr. Flynn is not a question for me at all. It is entirely a question for you, and I do not want to make any inference or suggestion or anything of the kind about that. You will take the evidence and determine the question yourself."

Finally, it is urged that the sentence is excessive under the modification of the Jones Act of January 15, 1931. These offenses for which appellant was convicted were committed July 25 and September 26, 1930, before this amendment became effective. The original Jones Act of March 2, 1929, § 1 (27 USCA § 91) provided, for transportation of more than one gallon of liquor, a fine, not to exceed $10,000, or imprisonment not to exceed five years, or both such fine and imprisonment. The court was therefore authorized to impose a maximum sentence of five years on each count, or an aggregate of ten years. Gurera v. United States (C. C. A. 8) 40 F.(2d) 338; McElvogue v. United States (C. C. A. 8) 40 F.(2d) 889. A single sentence on two counts, which does not exceed the maximum that might be imposed on both counts, is valid, and, being well within the discretionary power of the court, will not be disturbed. Myers v. Morgan (C. C. A. 8) 224 F. 413; Adams v. White (C. C. A. 8) 31 F. (2d) 982; Hyde v. United States (C. C. A. 8) 198 F. 610; Blake v. Moyer (C. C. A. 5) 208 F. 678.

The evidence in this case shows that appellant was not a casual offender, but was continuously engaged in violations of the prohibition law. There was therefore no abuse of discretion in the penalty imposed.

This disposes of the specifications argued orally and in the brief of counsel for appellant. We have, however, examined the other assignments, and find no reversible error. The judgment accordingly is affirmed.